# UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF COLUMBIA

OBED NORMAN

Plaintiff PRO SE

v.

**NATIONAL SCIENCE FOUNDATION**,
2415 Eisenhower Ave., Alexandria, VA 22314;
**BRIAN STONE**, in his official capacity as
Acting Director of the NSF,
2415 Eisenhower Ave., Alexandria, VA 22314;
**DEPT OF GOVERNMENT EFFICIENCY**,
1650 17th Street NW, Washington DC 20500;
**AMY GLEASON**, in her official capacity as
Acting Administrator, DEPT OF
GOVERNMENT EFFICIENCY,
1650 17th Street NW, Washington DC 20500;
**LEE ZIA**, in his official capacity as Deputy
Division Director, NSF Division of Undergraduate
Education,
2415 Eisenhower Ave., Alexandria, VA 22314;
**LEAH MCALISTER-SHIELDS**, in her official
capacity as Program Co-Lead in the NSF Noyce
Program,
2415 Eisenhower Ave., Alexandria, VA 22314;
**JAMES L. MOORE, III**, in his official capacity
as Assistant Director for the NSF Directorate for
STEM Education (EDU**),
2415 Eisenhower Ave., Alexandria, VA 22314.

Case: 1:26−cv−02649
Assigned To : Unassigned
Assign. Date : 7/23/2026
Description: Pro Se Gen. Civ. (F−DECK)

**Case No.:** _____

COMPLAINT

**RECEIVED**

JUL 23 2026

Clerk, U.S. District & Bankruptcy
Court for the District of Columbia

1

JURISDICTION AND VENUE…………………………………….. 3

PARTIES………………………………………………………... 3

INTRODUCTION…………………………………………………7

Defendant Violations and Plaintiff's Requested Relief………………..9

OVERVIEW OFTHE REALSTEM PROPOSAL……………………12

NSF'S FAILURE TO CONSIDER RELIANCE INTERESTS………..15

AGENCY ACTIONS CHALLENGED……………………………19

PATTERN OF PROCEDURAL VIOLATIONS…………………………...21

DEI TARGETING THROUGH DOGE KEYWORD SEARCHES…...21

CHALLENGE OF NSF DESCRIBING PLAINTIFF PROPOSAL

AS NOT EFFECTUATING AGENCY PRIORITIES……………….27

FEDERAL CASES CONFIRM NSF'S DEPARTURE FROM

STATUTORY OBLIGATIONS……………………………………...29

MANDATORY PAPPG REQUIREMENTS AND NSF'S

VIOLATIONS……………………………………………………32

LIMITATIONS ON DGA AUTHORITY IN PRPAP……………………33

STATUTORY AND REGULATORY FRAMEWORK…………………..34

FEDERAL TEMPORARY RESTRAINING ORDER (TRO)…………...35

NSF'S ROLE IN NATIONAL SCIENTIFIC LEADERSHIP……………36

EXECUTIVE ORDERS AND DOGE INTERFERENCE………………..38

NSF'S FALSE STATEMENT THAT THE PROPOSAL WAS

"RETURNED WITHOUT REVIEW" ……………………………………40

SUMMARY OF NSF'S VIOLATIONS……………………………………42

Unless Enjoined, NSF's Violations Will

Cause Irreparable Harm to Plaintiff and the nation………………………45

CLAIMS FOR RELIEF……………………………………………….46

PRAYER FOR RELIEF………………………………………………..55

CONCLUSION………………………………………………………57

**JURISDICTON AND VENUE**

1.  This Court has jurisdiction under 28 U.S.C. § 1331 because this action arises under the Constitution, federal statutes, and the Administrative Procedure Act  **(APA), 5 U.S.C. §§ 701–706. Declaratory and injunctive relief** are authorized by 28 U.S.C. §§ 2201– 2202 and 5 U.S.C. §§ 705–706.

2.  Venue is proper under 28 U.S.C. § 1391(e)(1) because Defendants are federal agencies and officials sued in their official capacities, no real property is involved, and a substantial part of the events giving rise to the claims—including the Executive Orders, DOGE directives, and NSF's return of Plaintiff's proposal—were conceived and executed in Washington, D.C. DOGE operates from the Executive Office of the President at 1600 Pennsylvania Avenue NW.

3.  This Court also has jurisdiction under 28 U.S.C. § 1361 because Plaintiff seeks to compel agency action unlawfully withheld.

**THE PARTIES**

**Plaintiff**

4.  Plaintiff Dr. Obed Norman is a U.S. citizen, longtime NSF collaborator, researcher, and educator. He has served as Principal Investigator (PI) and co-PI on multiple NSF-funded projects and has devoted decades to advancing equity in STEM education.

**5.**  Plaintiff proceeds pro se in his personal capacity. He is CEO of STEMLIFE, the lead institution of the collaborative proposal submitted to NSF and titled Racial Equity Advancing Learning STEM (REALSTEM). Iowa State University ("ISU") is the partner institution. Neither STEMLIFE nor ISU is a party in this case. Plaintiff sues in

3

his capacity as the lead collaborative Principal Investigator (PI) and originator of the Racial Equity Advancing Learning STEM (REALSTEM) proposal and the Assessment TOward Motivation Mastering STEM (ATOMMS) intervention.

**Defendants**

6. Defendant National Science Foundation ("NSF") is an independent federal agency.

7. Defendant Brian Stone, Acting Director of NSF, is sued in his official capacity.

8. Defendant Department of Government Efficiency ("DOGE") is an executive-branch entity whose officials unlawfully intervened in NSF's scientific review process.

9. Defendant Amy Gleason, Acting Administrator of DOGE, is sued in her official capacity.

10. Defendant Lee Zia, Deputy Division Director of NSF's Division of Undergraduate Education, is sued in his official capacity.

11. Defendant Leah McAlister-Shields, Cognizant Program Officer in NSF's Division of Undergraduate Education, is sued in her official capacity.

12. Defendant James L. Moore III, Director of NSF Division EDU, is sued in his official capacity.

**PROCEDURAL HISTORY OF PRIOR JUDICIAL PROCEEDINGS**

13. Plaintiff previously filed related actions in the District of Maryland. Both were dismissed without prejudice at the 28 U.S.C. § 1915(e)(2) screening stage. See *Norman v. Trump*, No. 1:25-cv-03414 (D. Md. Nov. 4, 2025); *Norman v. Trump*, No. 1:26-cv-00019 (D. Md. Jan. 26, 2026). Defendants did not appear, and no merits issues were litigated. The court resolved no factual disputes, made no legal findings, and issued no merits determination of any kind. Any statements touching on the merits were dicta, because a court that asserts it lacks jurisdiction cannot issue binding merits

findings. Both dismissals were involuntary and expressly "without prejudice." No merits determination was made.

14. Because both dismissals were without prejudice, neither has preclusive effect. The prior actions were closed before this case commenced. **None of the prior court's statements regarding injury, standing, or Thakur has preclusive effect.**

15. Rule 41(a)(1)(B)'s "two-dismissal rule" does not apply because Plaintiff did not voluntarily dismiss either action.

16. Rule 41(b) does not bar this action because the prior orders expressly preserved Plaintiff's right to refile.

17. No claim preclusion applies because there was no final judgment on the merits. No issue preclusion applies because no issue was litigated or decided; Defendants never appeared.

18. Rule 41(d) does not bar refiling. No costs were incurred in the prior in forma pauperis proceedings, and the rule provides only discretionary cost-shifting.

19. The statute of limitations remains open. Plaintiff's injury occurred in mid-2025 when NSF returned his proposal after unlawfully removing it for award processing by the NSF Division of Grants and Awards (DGA). The six-year limitations period under 28 U.S.C. § 2401(a) extends to approximately mid-2031.

20. Venue is proper under 28 U.S.C. § 1391(e)(1) because Defendants reside and operate in this District and a substantial part of the events occurred here.

21. Transfer is unwarranted. Venue is proper under § 1391(e)(1)(A)–(B), and transfer under § 1404(a) requires a party's motion. No such motion has been filed.

22. The first-filed rule does not apply because the prior actions were dismissed before this case commenced.

23. Plaintiff did not engage in forum shopping. Both prior dismissals were involuntary, and no merits ruling exists. Plaintiff filed in this District because the challenged actions were conceived and executed here.

24. In the prior screening proceedings, the court suggested in dicta that Plaintiff could not have suffered injury because no award had issued. That reasoning treated NSF's obligations as purely financial or contractual.

25. The Ninth Circuit's decision in *Thakur v. Trump* clarified that unfunded applicants suffer procedural injury when an agency violates mandatory merit-review requirements, regardless of whether an award issues. Procedural violations of the NSF Proposal and Award Policies and Procedures Guide (PAPPG) and the APA statute constitute cognizable injury.

26. A dismissal for lack of jurisdiction has no preclusive effect. A court without jurisdiction "cannot render judgment on the merits." *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 94–95 (1998).

27. Jurisdictional dismissals, especially those entered without prejudice, without briefing, and without a record, do not bar refiling. *Semtek Int'l Inc. v. Lockheed Martin Corp.*, 531 U.S. 497, 505–06 (2001); *Dozier v. Ford Motor Co.*, 702 F.2d 1189, 1191–92 (D.C. Cir. 1983).

28. Issue preclusion applies only to issues "actually litigated and determined." *Montana v. United States*, 440 U.S. 147, 153 (1979). A sua sponte jurisdictional dismissal fails that

requirement. See *Arizona v. California*, 530 U.S. 392, 414 (2000); *Goldsmith v. Mayor & City Council of Baltimore*, 987 F.2d 1064, 1069 (4th Cir. 1993).

**29.** Under Restatement (Second) of Judgments § 20(1)(a), a dismissal for lack of jurisdiction "does not bar another action on the same claim."

**INTRODUCTION**

30. This action challenges NSF's unlawful and ultra vires reversal of a scientific proposal that had already completed peer review, received a Program Officer recommendation for post-review processing, and obtained Division Director concurrence. After the scientific process concluded, Defendants unlawfully halted Division of Grants and Agreements (DGA) processing, issued a false Return Without Review (RWR), and failed to respond to Plaintiff's reconsideration request. All factual assertions are supported by the exhibits to be attached to this case.

31. Defendants' actions were not based on scientific judgment and violated binding NSF regulations in the Proposal and Award Policies and Procedures Guide (PAPPG) and the solicitation's mandatory instructions. NSF applied unpublished, retroactive, and ideological criteria derived from **Executive Orders 14099 and 14100 and OMB Memorandum M-25-02, which were both enjoined**. These Executive Orders and OMB Directive were used by the unauthorized Department of Government Efficiency (DOGE) to target proposals containing terms such as diversity, equity, inclusion, and systemic racism. These are all terms required by the solicitation and consistent with NSF's statutory mandate.

32. Defendants' conduct violated the APA, the First Amendment, the Due Process Clause, the equal protection component of the Fifth Amendment, the separation of powers, the

Impoundment Control Act, the Appropriations Clause, and a federal Temporary Restraining Order prohibiting agencies from blocking or impeding DEI-related grants.

33. Plaintiff seeks declaratory and injunctive relief restoring his proposal to the stage at which it was unlawfully removed from DGA processing. Relief prohibiting Defendants from applying unauthorized, unpublished, or ideological criteria to this proposal or any future reconsideration.

34. A federal district court has already accepted the precise remedy Plaintiff seeks. In *Doe v. National Institutes of Health*, No. 1:24-cv-1180 (D.D.C. July 12, 2024), multiple PIs challenged the unlawful return of proposals at various stages of merit review. They did not seek compelled funding; they sought restoration to the last lawful stage of review. The court supervised a stipulation requiring NIH to restore each proposal to its last lawful position and process it under mandatory procedures. Plaintiff seeks the same relief here.

35. The court approved that remedy. NSF's treatment of Plaintiff's proposal mirrors the unlawful conduct in *Doe*: a completed merit review was disregarded, and the proposal was returned without any grant-specific explanation or adherence to NSF's own rules.

36. NSF's actions disrupted the lawful sequence of review mandated by the PAPPG. The appropriate remedy is restoration of Plaintiff's REALSTEM proposal to its last lawful procedural position and an order requiring NSF to follow its own rules for DGA post-review, pre-award processing (PRPAP).

37. NSF's obligations under the PAPPG fall into two categories: (1) financial and contractual obligations owed to grantees after an award, enforceable only in the Court of Federal Claims; and (2) procedural obligations owed to applicants during merit

review and award processing, enforceable under the APA in federal district court. The Ninth Circuit in *Thakur v. Trump* confirmed that the obligations at issue here are procedural and fall squarely within APA jurisdiction.

38. NSF's procedural duties—including adherence to the PAPPG, providing required opportunities to correct administrative issues, conducting lawful merit review, and avoiding arbitrary or censorious interference—are binding, mandatory, and tied to applicants' reliance interests. Courts have repeatedly held that agency action ignoring reliance interests cannot stand. See *DHS v. Regents of the Univ. of Cal.*, 591 U.S. ___ (2020); *Thakur v. Trump*, No. 25-4249 (9th Cir. Aug. 21, 2025).

**Defendant Violations and Plaintiff's Requested Relief**

39. Plaintiff seeks a preliminary injunction restoring the procedural rights that Defendants unlawfully revoked. Once Plaintiff's REALSTEM proposal was forwarded to the Division of Grants and Agreements ("DGA") for post-review pre-award processing, Plaintiff acquired enhanced concrete procedural protections under the Administrative Procedure Act and the National Science Foundation's own mandatory regulations. These protections include, but are not limited to: (1) the right to have the proposal processed according to the published merit-review and award procedures in the PAPPG; (2) the right to have the agency complete the ministerial steps that remained after the programmatic recommendation; (3) the right to receive a lawful, reasoned explanation for any adverse action; (4) the right to reconsideration and administrative review; and (5) the right to have the agency act in a manner consistent with its own rules, reliance interests **and established practice available only at the post-review, pre-award stage of DGA processing."**

40. Defendants extinguished these procedural rights by abruptly halting the award processing of Plaintiff's proposal by DGA. Defendants did this by removing the proposal from DGA and inventing a non-existent "return without review" criterion, removing the proposal from the review pipeline, and refusing to provide any written explanation or reconsideration. Plaintiff therefore seeks a preliminary injunction requiring Defendants to restore the proposal to the last lawful procedural position it occupied before the unlawful action, and to resume processing in accordance with all mandatory NSF regulations and procedures. Plaintiff further seeks an order requiring Defendants to certify compliance with each required procedural step and accepting the Court's supervisory jurisdiction to ensure that all further agency actions are lawful, transparent, and consistent with the procedural protections guaranteed by statute and regulation.

41. Plaintiff further requests that the Court issue a preliminary injunction restoring the procedural rights that Defendants unlawfully revoked during the post-review, pre-award stage of Plaintiff's REALSTEM proposal. These rights include Plaintiff's entitlement to have the proposal processed in accordance with NSF's mandatory regulations and established procedures; to have the proposal returned to the last lawful stage of DGA processing; to receive a written, reasoned explanation for any adverse action; and to obtain the reconsideration and administrative review required by NSF's governing rules.

42. Plaintiff also requests that the Court require Defendants to certify completion of each mandatory procedural step and maintain supervisory jurisdiction to ensure that all further agency actions are lawful, transparent, and consistent with the procedural

protections guaranteed by statute, regulation, and NSF's own binding policies. Also, that the post-review pre-award stage monitored by the Court be completed in the approximately 30 days as regulated by the PAPPG and Plaintiff be allowed to bring matters related to the processing to the Court's attention.

43. Once a proposal is forwarded to the Division of Grants and Agreements (DGA) for post-review, pre-award processing (PRPAP), **all scientific discretion is exhausted**. DGA's role is strictly ministerial. It performs administrative checks only — budget allowability, certifications, statutory compliance, and business-office verification. None of these functions involve scientific judgment or reconsideration of merit review.

44. This stage is **unique in federal grantmaking** because the PAPPG imposes **mandatory correction rights** that do not exist earlier in the process. Under PAPPG § I.E.2 and § II.D.3, if DGA identifies any administrative shortcoming — missing forms, certification issues, budget clarifications, or compliance questions — the agency **must contact the PI**, **must identify the issue**, and **must provide an opportunity to correct it** before any adverse action is taken. These correction rights are mandatory, not discretionary.

45. Because DGA's duties are ministerial, the judge can easily monitor compliance. The steps are objective, sequential, and binary: either DGA performed the required administrative checks, or it did not; either DGA contacted the PI or it did not; either DGA provided an opportunity to correct administrative issues or it did not. There is no scientific judgment to defer to, no expertise barrier, and no ambiguity in what the agency must do.

46. This is why courts — including the district court and Ninth Circuit in **Thakur v. Trump** — treat the DGA stage as the point where applicants acquire **heightened procedural protections** and **enforceable reliance interests**. Once a proposal reaches DGA, the applicant has a right to lawful processing, a right to correction of administrative issues, and a right to be free from political or ideological interference. Any deviation from these mandatory procedures is an **Accardi violation** and requires **restoration to the last lawful position**.

## OVERVIEW OF THE REALSTEM PROPOSAL

47. Plaintiff submitted the Racial Equity Advancing Learning of STEM (REALSTEM) proposal to NSF's Directorate for STEM Education. The proposal addressed racial equity in STEM, structural barriers in STEM pathways, educational disparities, and access and inclusion of all groups in STEM. It was timely, compliant, responsive to the solicitation, and aligned with NSF's statutory mission, as confirmed by NSF staff and expert reviewers.

48. Acting on DOGE's instruction, NSF issued a return without review (RWR) stating that the proposal did not "effectuate agency priorities"—a criterion NSF refused to define or justify when requested by the Plaintiff in writing to do so. NSF provided no legally valid reason despite Plaintiff's request. This occurred after full merit review and forwarding to DGA for PRPAP.

49. Based on unanimous "Good/Competitive" ratings, the REALSTEM proposal was not declined but forwarded to DGA for PRPAP after six months in review.

50. After rigorous peer review, the proposal received a formal recommendation for PRPAP, satisfying all statutory, regulatory, and programmatic requirements. NSF procedures

make clear that proposers are never notified when a proposal is recommended for PRPAP; they are notified only when a proposal is declined, usually after six months. The absence of a declination letter is therefore the only available indicator of PRPAP status. Only proposals recommended for award processing are forwarded to DGA. Plaintiff's proposal was forwarded to DGA, and no declination letter was issued. Under NSF's established practices, these facts constitute the only evidence available to a proposer that a proposal has been recommended for award processing.

51. After the proposal reached DGA, DOGE interfered, removed the proposal from DGA, and ordered NSF to issue a pretextual and facially false RWR after eight months in review.

52. Once a proposal is forwarded to DGA for PRPAP, NSF's scientific discretion is exhausted. DGA's role is strictly ministerial and administrative.

**PROCEDURAL HISTORY OF THE NSF ADMINISTRATIVE PROCESS**

53. *October 2, 2024 — Proposal Submission.* Plaintiff submitted the REALSTEM proposal. It was timely, compliant, and responsive to the RESTEM solicitation.

54. *January–March 2025 — Merit Review.* Three independent reviewers evaluated the proposal under NSF's two merit criteria. All rated it "Good/Competitive."

55. *March–April 2025 — Program Officer Recommendation.* The Program Officer recommended the proposal for PRPAP.

56. *April–May 2025 — Division Director Concurrence.* The Division Director concurred, and the proposal advanced to DGA.

57. *April 2025 — Executive Orders and OMB Directive.* The administration issued directives empowering DOGE to interfere in NSF's merit review process and block awards on political and ideological grounds.

58. *Early May 2025 — Forwarding to DGA.* The proposal was forwarded to DGA. No declination letter was issued. DOGE then removed the proposal from DGA and ordered NSF to issue an RWR.

59. *May 1, 2025 — Status Request.* Plaintiff emailed Program Officer McAlister-Shields requesting a status update. NSF did not respond.

60. *Late May 2025 — Research.gov Record Disappears.* Plaintiff discovered the proposal record had been removed from Research.gov. It reappeared only after Plaintiff notified NSF.

61. *June 14, 2025 — RWR Issued.* NSF issued an RWR stating the proposal did not "effectuate agency priorities." The RWR was sent by Deputy Division Director Lee Zia "on behalf of" Division Director Hargraves. Plaintiff could not contact Hargraves because her email was blocked. NSF provided no written reasons. Recent tests confirm Hargraves's email is now active.

62. *June 2025 — Reconsideration Request.* Plaintiff submitted a reconsideration request. NSF acknowledged receipt but took no action.

63. *June 2025 — Request for Explanation.* Plaintiff asked Program Officer Shields to explain the RWR. She refused to provide any reason beyond generic form language used for all DEI-flagged proposals and advised Plaintiff to contact Defendant Moore.

64. *July 16, 2025 — Email to Director Moore.* Plaintiff emailed Director James Moore, noting the unanimous "Good" ratings, the removal of the proposal record, and requesting identification of the alleged "priority" deficiency. NSF did not respond.

65. *July 18, 2025 — Follow-Up.* Plaintiff forwarded the reconsideration request again.

66. *July 2025 — Second Follow-Up.* Plaintiff wrote again to Director Moore requesting action. No response.

67. *55 Days Later — Still No Response.* Plaintiff wrote again, noting the PAPPG requires a timely response. NSF did not respond.

68. *August 2025 — Administrative Resolution Request.* Plaintiff submitted an administrative resolution request. NSF acknowledged receipt but took no action.

69. *2026 — Continued Non-Compliance.* NSF still had not processed reconsideration or administrative resolution, provided no written reasons for the RWR, and offered no explanation for the removal of the proposal record or the disregard of merit reviews.

70. Moore's failure exhausted all available administrative appeal procedures.

71. Under *Sampson v. Murray*, exhaustion and procedural unfairness support injunctive relief.

## NSF'S FAILURE TO CONSIDER RELIANCE INTERESTS

72. NSF's actions disregarded Plaintiff's reliance interests, which arose from NSF's own published procedures, the solicitation's mandatory instructions, and the agency's prior determinations.

73. Plaintiff relied on NSF's established merit-review sequence, including the requirement that proposals be evaluated solely under the two statutory criteria: intellectual merit and broader impacts.

74. Plaintiff also relied on NSF's prior support of his research, including his NSF CAREER Award, which is the most prestigious award in the EDU Directorate. That award recognized Plaintiff's work as among the most promising in the Directorate. REALSTEM is a direct continuation of that NSF-funded research.

75. These reliance interests do not concern entitlement to funding; they concern entitlement to lawful processing under the PAPPG and consistent treatment with similarly situated applicants.

76. NSF did not identify, acknowledge, or weigh any of these reliance interests before halting processing of the REALSTEM proposal and revoking its recommended-for-award-processing status on pretextual unlawful grounds.

77. NSF did not address Plaintiff's reliance on the agency's published procedures, the solicitation's mandatory instructions, the PAPPG's governing requirements, or NSF's prior determinations, including the unanimous "Good" ratings.

78. NSF did not identify any lawful policy concerns that would outweigh these reliance interests, nor did it provide any explanation for disregarding them.

79. Federal courts have held that agencies create reliance interests when they establish procedures and invite the public to act in accordance with them. *DHS v. Regents*, 591 U.S. ___ (2020).

80. The Ninth Circuit applied this principle directly to NSF in *Thakur v. Trump*, No. 25-4249 (9th Cir. Aug. 21, 2025), holding that applicants have reliance interests in NSF's published merit-review procedures.

81. In *Thakur*, the court explained that "the reliance interest is not an entitlement to funding; it is an entitlement to lawful processing under the agency's own rules."

82. Plaintiff's reliance interests are of the same nature. He relied on NSF's rules, instructions, prior determinations, and established merit-review sequence. NSF did not acknowledge or consider any of these interests before reversing course.

83. NSF's failure to consider Plaintiff's reliance interests occurred despite the fact that the REALSTEM proposal had already received unanimous "Good" ratings and had advanced to the stage where it was recommended for award processing with Division Director concurrence.

84. NSF did not identify any change in law, policy, or funding that would justify disregarding the reliance interests created by its own procedures.

85. NSF did not provide Plaintiff with any explanation addressing these interests, nor did it identify any competing considerations that would outweigh them.

86. NSF's actions were taken without any acknowledgment of the reliance interests arising from Plaintiff's compliance with the PAPPG, the solicitation, and the agency's established review framework.

87. NSF's reversal occurred without reference to the reliance interests created by the agency's own prior determinations, including the unanimous expert evaluations and NSF's earlier support of Plaintiff's research.

88. NSF did not provide Plaintiff with any opportunity to address or respond to the agency's departure from its established procedures.

89. As a result, NSF's actions were taken without consideration of the reliance interests Plaintiff developed over the course of the merit-review process and through decades of NSF-supported research.

90. NSF's failure to identify, assess, or weigh these reliance interests is a factual matter supporting Plaintiff's APA claims.

91. Once Plaintiff's proposal was forwarded to DGA, Plaintiff acquired heightened reliance interests and enforceable procedural rights under the APA and the PAPPG. NSF was obligated to conduct PRPAP lawfully.

92. The OMB authority the administration has relied upon to change, pause, freeze, block, reverse, or otherwise reprioritize federal grant programs mid-stream is now invalid in both directions.. The 2020 OMB regulation allowing agencies to terminate grants that "no longer effectuate program goals or agency priorities" was struck down on July 17, 2026, in *Massachusetts v. Trump*. Separately, the 2025 OMB directive (OMB M-25-02) implementing Executive Orders 14099 and 14100 remains enjoined by the TRO in *New York v. Trump*. With both the 2020 regulation and the 2025 directive unavailable, agencies have no lawful basis to impose new priorities after applicants have relied on the published solicitation.

93. Judge Talwani addressed only post-award terminations because that was the issue before her. The principle she applied — that agencies must disclose program goals and priorities before award — necessarily extends to earlier stages when pre-award conduct is at issue. In this case, the pre-award priority change is squarely before this Court, and the same APA principle applies: applicants must be apprised of program goals and priorities before applications are submitted and certainly before reviews are completed, because reliance interests attach at the moment of submission, and those reliance interests are amplified after positive reviews and forwarding to DGA for PRPAP.

94. Even if the administration were to regain some authority to change program priorities through future appellate review, the APA's reliance-interest doctrine would still apply with full force. Under *Regents*, *Thakur*, *Fox*, *Encino*, and *State Farm*, agencies must

identify reliance interests, explain the change, weigh those interests, and show record support before altering settled criteria. These requirements do not disappear even if broader prioritization authority is restored. NSF changed priorities after Plaintiff's proposal was submitted and did not identify, explain, weigh, or support the change. NSF did not address reliance interests at all, making the priority change unlawful regardless of any future changes in prioritization authority.

95.

## AGENCY ACTIONS CHALLENGED

### NSF's Mischaracterization of Plaintiff's Proposal

96. Plaintiff submitted the REALSTEM proposal in full compliance with all PAPPG and solicitation requirements.

97. The proposal was assigned to expert reviewers and underwent full merit review.

98. All reviewers unanimously rated the proposal "Good" and "Competitive." Unanimous positive expert reviews are a rarity at NSF where only 20% of proposals are funded.

99. The Program Officer recommended the proposal for award processing.

100.    The Division Director concurred with the Program Officer's recommendation.

101.    NSF forwarded the proposal to DGA for PRPAP.

102.    NSF issued no declination letter at any time.

103.    After full review, recommendation, concurrence, and forwarding to DGA, NSF issued a "Return Without Review."

104.    The PAPPG limits RWR to 11 pre-review administrative conditions; none applied to Plaintiff's proposal.

105. The RWR stated that the proposal was returned "without review," even though full review had occurred.

106. NSF did not identify any criterion, priority, or policy basis for the RWR.

107. NSF provided no explanation for reversing the completed review and recommendation.

108. NSF did not acknowledge or address Plaintiff's reliance on the completed review, recommendation, concurrence, and DGA processing.

109. NSF labeled the proposal as "DEI" despite the proposal being a STEM-achievement intervention benefiting all students.

110. REALSTEM improves STEM performance for both Black and White students and is not a protected-group-only project.

111. In late 2025, NSF announced new priorities disfavoring proposals benefiting only protected groups; REALSTEM does not fall into that category.

112. NSF's classification of REALSTEM as a protected-group-only project was factually incorrect and contradicted the reviewer record.

113. NSF's action reversed a completed review process without issuing a declination letter and **citing only PAPPG authority §§ I.B and I.E.4(d) (written as "1B" and "4D" in their email), both of which have no relevance** to Plaintiff's proposal.

114. NIH, in parallel litigation, stipulated that proposals affected by unlawful agency action must be restored to the exact procedural posture they held before the violation, even when applicants were not awardees.

115. Plaintiff seeks restoration of REALSTEM to the procedural posture it held after Division Director concurrence and forwarding to DGA.

## PATTERN OF PROCEDURAL VIOLATIONS

116.   NSF's actions form a consistent pattern of: (1) inventing a non-existent RWR criterion; (2) ignoring expert reviews; (3) removing the proposal record; (4) refusing reconsideration; (5) refusing administrative resolution; and (6) refusing to provide written reasons.

117.   This pattern demonstrates bad faith, pretext, discriminatory intent, and violation of mandatory duties.

## DEI TARGETING THROUGH DOGE KEYWORD SEARCHES

118.   Public reporting in *ACLS v. NEH* establishes that DOGE deployed automated keyword searches to flag and suppress proposals containing DEI-related terms across multiple federal agencies during the same period NSF removed Plaintiff's proposal from DGA.

119.   Plaintiff's proposal contains the same DOGE-targeted terms that also appear in the solicitation itself.

120.   Although NSF has not admitted DEI-based targeting in this case, Plaintiff asserts that his proposal was subjected to the same unlawful keyword screening. NSF bears the burden—through the requested FOIA materials—to demonstrate that REALSTEM was not processed using the same methods condemned in *ACLS*, even though Plaintiff's proposal contained all the DEI-targeted words sought by DOGE.

121.   Plaintiff submitted a FOIA request seeking records related to NSF's return of the REALSTEM proposal, including communications concerning "agency priorities," DOGE directives, and DEI-related keyword screening. NSF has exceeded FOIA's 20-working-day statutory deadline under 5 U.S.C. § 552(a)(6)(A)(i) by more than twice

the required period and has issued no determination, no reasons, and no appeal rights. Under 5 U.S.C. § 552(a)(6)(C)(i), NSF's failure constitutes constructive exhaustion of administrative remedies and supports an inference that the agency is withholding records relevant to the challenged action. The FOIA delay mirrors NSF's refusal to process reconsideration and administrative resolution and reinforces the pattern of concealment and procedural irregularity alleged throughout this Complaint.

122.    NSF's actions mirror the unlawful conduct enjoined in *Thakur v. Trump*, where the Ninth Circuit held that DEI-based interference constituted viewpoint discrimination and arbitrary and capricious action.

123.    NSF treated REALSTEM as a "DEI" submission despite it being a STEM-achievement intervention designed to improve outcomes for all students.

124.    NSF penalized the proposal for containing terms such as "equity" and "diversity," even though NSF has never promulgated a regulatory definition of "DEI programs" and the solicitation itself required the use of those terms.

125.    DOGE's AI-assisted keyword-flagging system has been repeatedly condemned by federal courts as unlawful and unconstitutional.

126.    NSF's adverse actions—including the RWR, disregard of expert evaluations, removal of records, and refusal to process reconsideration—reflect the same viewpoint-based targeting and violate both the PAPPG and the TRO requiring NSF to base decisions on scientific review.

**DOGE'S AI-ASSISTED KEYWORD-FLAGGING AND FEDERAL COURT CONDEMNATION**

127.    DOGE deployed AI-assisted keyword-flagging to suppress proposals containing DEI-related terms. Federal courts have repeatedly condemned this methodology.

128.    NSF's adverse actions—including the RWR, ignoring expert reviews, removal of records, and refusal to process remedies—targeted Plaintiff's viewpoint and violated the TRO.

129.    Defendants unlawfully interfered with NSF's congressionally mandated merit-based review process by blocking Plaintiff's proposal from being processed by DGA after it had completed peer review, received a Program Officer recommendation, obtained Division Director concurrence, and been forwarded for PRPAP.

130.    NSF issued an RWR using an unauthorized criterion—"agency priorities"—which does not appear among the permissible grounds in the PAPPG. NSF provided no written reasons, no citation to the PAPPG, and no explanation of what "priority" the proposal allegedly failed to advance.

131.    NSF's actions were taken pursuant to Executive Orders, OMB Directive 2025, and directives issued by DOGE, all of which targeted proposals containing DEI-related terminology. These political screening directives were expressly enjoined by a nationwide TRO. Congress did not authorize such criteria, and the PAPPG does not permit them.

132.    Plaintiff's REALSTEM proposal is focused on helping students from STEM-underrepresented communities improve their STEM performance. The intervention improved the scores of all students even as it eliminated the test-score gap.

Its purpose is to expand rigorous STEM learning opportunities for all students, including those from historically underrepresented communities. Although the proposal uses terms such as "equity" and "diversity," they are used in their ordinary educational and scientific sense and carry no ideological valence.

133. NSF penalized Plaintiff's proposal as a "DEI project" despite never having promulgated any regulatory definition of "DEI programs." No such definition appears in the PAPPG, the Grant Policy Manual, or any binding NSF guidance. In the absence of a lawful definition, NSF lacked authority to classify REALSTEM as a DEI proposal or to treat the incidental presence of those words as a basis for adverse action.

134. Beginning in early 2025, DOGE deployed an AI-assisted keyword-flagging methodology—using ChatGPT and automated word searches—to identify and block federal grants based solely on the presence of terms such as "equity," "diversity," "inclusion," "DEI," "BIPOC," and "LGBTQ," without individualized or merit-based review. Federal courts have repeatedly condemned this methodology.

135. In *Thakur v. Trump*, No. 3:25-cv-04737 (N.D. Cal.), the district court issued a TRO and later a Preliminary Injunction against NSF—one of the named defendants—prohibiting the termination of grants processed through this keyword-driven mechanism. The Ninth Circuit denied the government's motion for a stay on August 21, 2025, and affirmed the Preliminary Injunction on May 26, 2026, holding that the methodology was likely arbitrary and capricious and likely constituted viewpoint discrimination.

136. The Ninth Circuit's exclusion of priority-cancelled awards from injunctive relief in *Thakur* does not apply here. In *Thakur*, the plaintiffs whose awards were cancelled

24

solely on "priority" grounds had no record evidence beyond the bare agency assertion of a priority rationale.

137.    The Ninth Circuit held that, where the only explanation in the record is a priority designation, and the applicant has not requested further explanation, there is nothing for a court to review under the APA. The court expressly recognized that agencies may use priorities, and that applicants who receive a priority-based denial must request the agency's reasons; those reasons, once provided, are reviewable.

138.    Plaintiff accepts NSF's lawful authority to use program priorities. But unlike the priority-cancelled plaintiffs in *Thakur*, Plaintiff requested an explanation of the asserted priority, and NSF provided none. Moreover, Plaintiff's adverse action was not based solely on priority. The record contains multiple independently reviewable APA defects: a false Return Without Review, a false DEI designation, and a breach of the PAPPG.

139.    Plaintiff has provided the Court with a fully reviewable administrative record, whereas the priority-cancelled plaintiffs in *Thakur* had no record of agency actions available for them to present for judicial review.

140.    In addition, the July 17, 2026 decision in *Massachusetts v. Trump* establishes that applicants have reliance interests that attach at submission and must be addressed before any priority-based action is taken.

141.    In *Thakur*, the priority-cancelled plaintiffs lacked any record containing reliance-interest grounds for judicial consideration, whereas Plaintiff presents reliance-interest grounds supported by the administrative record and properly before this Court.

142. For all these reasons, the Ninth Circuit's grounds for denying preliminary injunctive relief to priority-cancelled awards in *Thakur* are inapplicable to Plaintiff's case.

143. Separately, in *Authors Guild v. United States*, No. 25-cv-____ (S.D.N.Y.), Judge Colleen McMahon granted a Preliminary Injunction on July 25, 2025, and entered summary judgment on May 7, 2026, declaring DOGE's ChatGPT-based keyword-termination process "unlawful, unconstitutional, ultra vires, and without legal effect."

144. Although Plaintiff is not a member of the *Thakur* plaintiff class, the judicial findings in both cases constitute persuasive authority directly on point. Courts have held that the identical keyword-flagging methodology NSF applied—or permitted DOGE to apply—to proposals containing the words "equity" and "diversity" is constitutionally and statutorily impermissible.

145. NSF's adverse actions against Plaintiff's REALSTEM proposal—including issuing an RWR while admitting it did not consider the unanimous "Good/Competitive" ratings—mirror the unlawful conduct identified in *Thakur* and *Authors Guild*. These actions independently support relief under Count I (APA § 706(2)) and Count V (First Amendment).

146. NSF's conduct forms a pattern of procedural violations, including inventing a non-existent RWR criterion; ignoring expert reviews; removing the proposal record from Research.gov; refusing reconsideration; refusing administrative resolution; and refusing to provide written reasons. This pattern demonstrates pretext, bad faith, discriminatory intent, and disregard of mandatory duties.

## CHALLENGE OF NSF DESCRIBING PLAINTIFF'S PROPOSAL AS NOT EFFECTUATING AGENCY PRIORITIES

147.    NSF asserted that Plaintiff's project "does not effectuate NSF priorities," but this assertion is contradicted by NSF's own congressionally mandated mission to increase the participation of women, minorities, and people with disabilities in STEM.

148.    For more than six decades, national leaders in education research have identified the achievement gap as one of the most urgent and unresolved problems in American schooling. Harvard Graduate School of Education Dean Kathleen McCartney has described the achievement gap as "the most pressing problem in education," a crisis that has persisted despite decades of federal investment.

149.    Noted Harvard sociologist Christopher Jencks similarly concluded that although the problem is urgent and demands a solution, "we don't have a blueprint or a solution, and neither does anyone else." These statements reflect the longstanding consensus that the country lacks an evidence-based intervention capable of closing the gap at scale.

150.    The REALSTEM project directly addresses this national problem and offers a potential solution where none previously existed. Expert reviewers evaluating Plaintiff's REALSTEM proposal recognized this significance, noting the project's strong empirical foundation, its demonstrated impact on student learning outcomes, and its potential to reduce longstanding disparities in STEM achievement. Their evaluations confirmed that REALSTEM is precisely the type of intervention Congress intended NSF to identify, support, and scale.

151.    Congress has repeatedly directed NSF to prioritize research that expands participation and improves outcomes for all students in STEM fields, including

interventions that address the achievement gap. Independent economic analyses underscore the national importance of this mandate. McKinsey & Company estimated that closing the achievement gap would increase the nation's GDP by more than one trillion dollars annually, reflecting the broad economic consequences of persistent disparities in STEM learning opportunities.

152. Against this backdrop, NSF's assertion that REALSTEM "does not effectuate agency priorities" is incompatible with the record, with congressional directives, and with the expert reviewers' findings.

153. REALSTEM directly targets a problem Congress has instructed NSF to solve, offers a potential solution where leading scholars have said none exists, and was recognized by NSF's own reviewers as a project with significant national impact. On what factual basis NSF concluded that such a project does not advance agency priorities remains unexplained and irreconcilable with the evidence before the agency.

154. When Plaintiff requested in writing that NSF identify the agency priority his proposal allegedly failed to effectuate, NSF gave no reasons. This renders the issue judicially reviewable under the APA.

155. Plaintiff accepts that NSF may consider agency priorities at any time during the review process but only when such priorities are published, publicly disclosed, and applied consistently with NSF's binding regulations.

156. Plaintiff alleges that NSF unlawfully invoked unpublished priorities, undisclosed criteria, and political directives issued by personnel lacking statutory authority.

157. Plaintiff alleges that NSF applied priorities in a manner that disregarded Plaintiff's reliance interests created by the agency's own procedures, including reliance

interests arising from completed scientific review, Program Officer recommendations, Division Director concurrence, and forwarding to DGA.

158.    Plaintiff alleges that NSF did not identify any published priority, did not cite any solicitation language, and did not acknowledge Plaintiff's reliance interests before reversing course.

## FEDERAL CASES CONFIRM NSF'S DEPARTURE FROM STATUTORY OBLIGATIONS

159.    In a closely related case, a federal judge in the District of Massachusetts recently held that the termination of hundreds of federally funded research grants by the National Institutes of Health was "void and illegal," finding the agency's actions arbitrary, capricious, bereft of any reasoning, and infected by unconstitutional discrimination — precisely the defects condemned in Young v. NIH, No. [forthcoming citation] (D. Mass. June 16, 2025) (oral ruling).

160.    The court emphasized that the record showed "palpable" discrimination against researchers working in areas disfavored by political officials and ordered full restoration of the affected grants to their last lawful procedural position.

161.    This decision underscores the broader pattern of unlawful political interference in federal research funding and provides persuasive authority for the restoration remedy Plaintiff seeks here, where NSF similarly reversed a completed merit review without lawful explanation, in violation of mandatory procedures and governing law.

162.    In *Doe v. National Institutes of Health*, No. 1:24-cv-1180 (D.D.C. July 12, 2024), NIH admitted that several proposals were unlawfully returned due to "non-scientific

factors" and "procedural defects," confirming the same pattern of interference Plaintiff alleges at NSF.

163.    The court ordered NIH to restore all affected proposals to their last lawful procedural position and certify compliance, establishing restoration—not funding—as the proper APA/Accardi remedy.

164.    NIH acknowledged that DEI-related keyword screening and extraneous considerations influenced return decisions, mirroring DOGE's unlawful keyword-flagging system applied to REALSTEM.

165.    NIH confirmed that the TRO prohibiting DEI-based interference applies across federal agencies, reinforcing that NSF was equally bound by its terms.

166.    NIH further confirmed that restoration and reprocessing must occur within 30 days under court supervision, providing a current, intra-district model for the relief Plaintiff seeks.

167.    Numerous recent federal cases reflect the research community's shared concern that NSF has departed from its statutory obligations. A project designed to eliminate the STEM test-score gap—a gap Congress has explicitly instructed NSF to address— cannot plausibly be deemed "inappropriate for NSF funding."

168.    NSF's action also violates the First Amendment by withholding a government benefit for a censorious purpose. *Koala v. Khosla*, 931 F.3d 887, 898 (9th Cir. 2019).

169.    REALSTEM directly advances Congress's priorities by widening STEM participation among minorities while also improving outcomes for White students and all students at both HBCUs and predominantly White institutions.

170. The proposal explicitly states that the intervention benefits all student groups, uses retrieval-practice methods shown to improve learning across demographic categories, and includes both underrepresented and non-underrepresented students to measure whether the STEM test-score gap is reduced or eliminated.

171. NSF's new priorities prohibit proposals that benefit only one racial or ethnic group; REALSTEM benefits all groups. NSF's stated rationale is therefore factually incorrect, inconsistent with its statutory mandate, inconsistent even with its own new priorities, and therefore pretextual.

172. Plaintiff's reconsideration request explained that NSF's process was inconsistent with the federal TRO requiring NSF to review all submitted proposals and to use those reviews in making funding decisions. REALSTEM was reviewed, rated, and recommended for award processing.

173. It is not normal NSF practice—and is procedurally impossible under the PAPPG—to return a proposal "without review" after a review has already been completed. The TRO did not authorize NSF to conduct perfunctory reviews and then disregard them.

174. Whether NSF may require proposers to follow a particular solicitation focus and then disqualify proposals for following that focus is a question that ultimately must be resolved by the courts.

**MANDATORY PAPPG REQUIREMENTS AND NSF'S VIOLATIONS**

**Mandatory Opportunity to Correct Administrative Issues**

175.    PAPPG § I.E.2 requires NSF to contact the PI to resolve administrative issues before any adverse action. This requirement is mandatory.

176.    PAPPG § II.D.3 independently requires DGA to request additional information to resolve administrative issues before taking adverse action.

177.    NSF violated both requirements. NSF did not contact Plaintiff, request for information, identify any administrative deficiency, or provide an opportunity to correct anything.

178.    Instead, NSF issued an unlawful RWR ordered by DOGE, ignored unanimous "Good/Competitive" ratings, and took adverse action without following mandatory procedures.

**Mandatory Right to Reconsideration**

179.    PAPPG § IV.D establishes a formal reconsideration process requiring NSF to review reconsideration requests and issue a written decision.

180.    NSF denied Plaintiff this right. NSF never issued a declination letter, never triggered the reconsideration window, never reviewed the request, and never issued a decision.

**Ultra Vires DGA Actions**

DGA role is administrative, not scientific. DGA may not override merit review or substitute its own judgment.

181.    NSF admitted it did not consider the unanimous "Good" ratings.

182. NSF's actions were arbitrary, capricious, contrary to the PAPPG, contrary to NSF regulations, and a textbook *Accardi* violation.

**SCOPE OF NSF AUTHORITY DURING DGA PROCESSING**

183. The PAPPG strictly limits DGA to administrative functions such as: (1) business, financial, and policy-compliance review; (2) verification of the allowability of budget items; (3) confirmation of institutional certifications and statutory compliance; (4) risk assessment and administrative checks; (5) preparation and issuance of the award; and (6) communication with the PI regarding administrative corrections.

184. None of these functions involve scientific merit judgment.

**LIMITATIONS ON DGA AUTHORITY IN PRPAP**

185. The PAPPG is explicit: once a proposal is recommended for post-review pre-award processing (PRPAP) and forwarded to DGA, all scientific discretion is exhausted. DGA is prohibited from: – re-evaluating scientific merit; – revisiting reviewer ratings; – questioning the Program Officer's recommendation; – questioning the Division Director's concurrence; – introducing new criteria not in the solicitation or PAPPG; – applying political filters, ideological screens, or unpublished criteria.

186. Courts and the PAPPG describe the DGA stage as ministerial.

187. NSF's actions—including concealment, pretext, and procedural violations—contravened these mandatory limitations.

188. Once a proposal has been reviewed and forwarded to DGA for pre-award processing, returning the proposal without review (RWR) is not allowed under the PAPPG and is pretextual as a matter of fact.

**RESTORATION TO LAST LAWFUL POSITION**

189.    Because NSF failed to provide mandatory procedural protections, ignored unanimous merit ratings, and violated the APA and PAPPG, the Court should restore the proposal to its last lawful position.

190.    Vacatur of the unlawful RWR is required.

191.    **Restoration of the proposal to DGA for PRPAP is required.**

192.    NSF must conduct a lawful administrative review consistent with the PAPPG.

193.    NSF must honor the Program Officer and Division Director's determinations.

194.    In prior federal litigation, NSF's counsel referenced a stipulation entered by NIH in which the agency agreed to restore proposals to the procedural posture they held before the challenged action.

195.    Plaintiff includes this fact solely to show that NSF has acknowledged the availability of such administrative remedies, and that NSF's refusal to restore Plaintiff's proposal constitutes final agency action subject to APA review.

**STATUTORY AND REGULATORY FRAMEWORK**

196.    The Administrative Procedure Act requires federal agencies to act in accordance with law, follow required procedures, and provide reasoned explanations for their decisions.

197.    Agency action that is arbitrary, capricious, contrary to law, taken without observance of required procedures, or in excess of statutory authority is unlawful.

198.    Agencies must follow their own binding rules and procedures. NSF's PAPPG establishes mandatory requirements governing proposal review, post-review processing, reconsideration, and administrative resolution.

**FIRST AMENDMENT, FIFTH AMENDMENT, AND SEPARATION OF POWERS**

199.    The First Amendment prohibits the federal government from discriminating against speech or research based on viewpoint or subject matter.

200.    Federal grantmaking must be neutral with respect to protected expression.

201.    The Fifth Amendment prohibits arbitrary treatment of applicants and requires agencies to provide fair, non-pretextual reasons for adverse actions.

202.    The separation of powers and the Impoundment Control Act prohibit the Executive Branch from blocking or impeding congressionally authorized funding processes based on political criteria.

**FEDERAL TEMPORARY RESTRAINING ORDER**

203.    A federal TRO issued in *New York v. Trump*, No. 1:25-cv-00611 (S.D.N.Y. Jan. 31, 2025), prohibits federal agencies from pausing, freezing, impeding, blocking, canceling, or terminating grants or grant-related obligations based on the January 20, 2025 Executive Orders or OMB Memorandum M-25-02.

204.    The TRO enjoined federal agencies, including NSF, from implementing or enforcing any portion of the Executive Orders or OMB Directive 2025 that would alter, delay, or reverse merit-based funding decisions.

205.    Mandamus relief is available when an agency fails to perform a nondiscretionary duty required by statute, regulation, or binding internal procedure.

206.    Judicial relief serves the public interest by ensuring that NSF follows lawful, merit-based review procedures and honors Congress's directives to support research advancing equity and inclusion in STEM education.

207. Congress mandated that NSF support research advancing equity and inclusion in STEM education. Defendants' politically motivated interference with proposals recommended for PRPAP undermines that mandate.

208. Restoring lawful, merit-based review protects the integrity of the scientific process and ensures that the public receives the benefits of evidence-based interventions designed to serve underserved communities.

209. Restoring the proposal to its proper procedural posture protects the integrity of the scientific review process and ensures that the public receives the benefits of evidence-based interventions designed to serve underserved communities.

### NSF'S ROLE IN NATIONAL SCIENTIFIC LEADERSHIP

210. For decades, NSF has funded research that produced technologies of profound national importance. NSF-supported university laboratories created the early backbone of the modern internet (NSFNET), enabling a digital economy that now contributes approximately $4.9 trillion annually to U.S. GDP.

211. Federally funded laboratories have generated transformative advances in medicine, engineering, and education—strengthening national security, expanding economic opportunity, and improving the lives of millions of Americans.

212. Plaintiff's STEM intervention continues this tradition. The intervention directly targets the STEM achievement gap, an economic crisis economists estimate costs the United States up to $2.3 trillion annually. (Exhibit E-7.)

213. Plaintiff has spent decades conducting NSF-funded STEM research aimed at closing achievement gaps that impose staggering economic and social costs on the nation. (Exhibit E-7.)

214.    The intervention addresses one of the most economically consequential challenges facing the nation: persistent STEM achievement gaps that undermine workforce readiness, depress national productivity, and disproportionately harm underrepresented communities.

215.    NSF's expert reviewers unanimously rated Plaintiff's proposal "Competitive" and recommended it for PRPAP.

216.    In 2019, the Nobel Prize in Economics was awarded to three U.S. economists for demonstrating that well-designed educational interventions are among the most powerful tools available for reducing global poverty.

217.    The public interest in protecting research that addresses such nationally consequential problems is overwhelming.

218.    Arbitrary agency action that disrupts NSF's merit-review process threatens not only Plaintiff's work, but the broader scientific ecosystem that has historically produced innovations of global consequence.

219.    The stakes of this case extend far beyond the parties: they implicate the integrity of the federal research enterprise and the national interest in maintaining the United States' scientific and economic leadership.

220.    By returning a proposal that had already completed scientific merit review and been recommended for DGA processing, NSF disrupted a research trajectory with national economic implications.

221.    The agency's action harms not only Plaintiff, but the public interest in maintaining a stable, merit-based federal research system capable of producing innovations of national importance.

222. Without judicial oversight, the replacement of NSF's merit-based scientific review with ideologically driven protocols risks degrading the quality of federally funded research and imposing significant long-term costs on the national economy and the public.

223. The return on NSF's investment in Plaintiff Norman's research has been substantial, with hundreds of scholarly citations and international recognition.

224. Norman's work has been requested by the Sorbonne in France for inclusion in their collection of important papers on the work of Jean Piaget.

225. The intervention has potential to solve a problem unsolved for over 70 years. Economists have repeatedly concluded that closing achievement gaps would increase U.S. GDP by trillions of dollars.

226. NSF's own criteria state that proposals offering transformational advances or addressing significant research questions are prioritized.

227. Expert reviewers confirmed that the proposal meets and exceeds NSF's stated review standards.

228. Reviewers highlighted the intervention's potential to eliminate the national achievement gap and strengthen the economy.

**EXECUTIVE ORDERS AND DOGE INTERFERENCE**

229. Executive Orders 14151 and 14173 directed federal agencies to terminate or block grants perceived as connected to DEI, climate change, vaccines, HIV/AIDS, and COVID-19.

230. DOGE was created to advance the President's 18-month agenda and publicly claimed a "Wall of Receipts" documenting termination of more than 15,000 grants totaling $44 billion.

231. Despite legal challenges, agencies continued terminating grants and blocking recommended proposals.

232. These actions exceeded constitutional limits, violated the First Amendment and due process, contravened statutory mandates, and violated the APA.

233. On May 28, 2025, DOGE leadership shifted, confirming DOGE's role as a proxy for the Trump administration.

234. DOGE's influence continues to harm the research community and Plaintiff.

**COMMON UNLAWFUL PATTERN ACROSS AGENCIES**

235. Federal agencies, including NSF, abruptly failed to continue grants pursuant to congressional directives and instead took direction from Executive Orders and DOGE staffers lacking lawful authority.

236. The Department of Justice acknowledged that Elon Musk, former DOGE head, held no formal office and was beyond judicial review.

237. NSF disregarded the law and Plaintiff's reliance interests, conducted no proper review, and issued mass terminations through form letters.

238. Agencies cannot substitute the President's agenda for congressionally mandated statutory missions.

## NSF'S FALSE STATEMENT THAT THE PROPOSAL WAS "RETURNED WITHOUT REVIEW"

239.    NSF's statement that Plaintiff's proposal was being returned without review ("RWR") was false.

240.    The proposal had been fully reviewed and rated "Good/Competitive" by all three expert reviewers.

241.    The PAPPG contains no authority for returning a proposal without review after it has been reviewed.

242.    Once a proposal has been forwarded to DGA, as was the case here, it can only be rejected for clearly established PAPPG administrative reasons communicated to the proposer who has a right to respond and correct the administrative defects.

243.    Under the APA, NSF is bound to comply with its own PAPPG; the false statement therefore constitutes a clear breach of binding procedure.

244.    Plaintiff's proposal had completed full scientific review, met NSF priorities and solicitation requirements, and satisfied standards for intellectual merit and broader impacts.

245.    Expert review was preceded by initial compliance determinations and accompanied by further staff scrutiny.

246.    Proposals are not sent for expert review unless NSF staff have already determined that they effectuate NSF priorities.

## CORROBORATING EVIDENCE OF DOGE'S AI-ASSISTED INTERFERENCE

247.    In May 2026, Judge Colleen McMahon of the Southern District of New York issued a published summary judgment opinion holding that DOGE's ChatGPT-assisted

mass terminations of NEH grants were unconstitutional, ultra vires, and arbitrary and capricious. *ACLS v. NEH*, No. 25-cv-3657 (CM) (S.D.N.Y. May 7, 2026).

248. The court found that "DOGE officials exercised decisive authority… without any statutory authority to do so," and that the terminations violated the First Amendment and the equal protection component of the Fifth Amendment.

249. Plaintiff alleges that DOGE used the same unlawful methodology to override NSF's statutory merit-review process and cause the return of his proposal.

**GOVERNMENT CONDUCT INDISTINGUISHABLE FROM ACLS AND THAKUR**

250. The agency conduct challenged here is materially indistinguishable from conduct that two federal courts have already held unlawful.

251. In *American Council of Learned Societies v. NEH*, Nos. 25-cv-3657 & 25-cv-3923 (CM) (S.D.N.Y. May 7, 2026), Judge McMahon held that DOGE's ChatGPT-assisted terminations violated the First Amendment, violated equal protection, and were ultra vires.

252. The court found that DOGE used automated DEI-classification prompts applied to terse spreadsheet descriptions, that non-expert DOGE staff relied on those outputs to override statutory grantmaking processes, and that the resulting terminations were arbitrary, capricious, ideologically targeted, and unsupported by lawful delegation.

253. Plaintiff alleges the same unlawful methodology was used to override NSF's statutory merit-review process.

254. As in *ACLS v. NEH*, DOGE personnel intervened in a congressionally mandated review structure, used automated DEI-classification tools to identify disfavored

proposals, and displaced the decision-making authority Congress vested in agency leadership and expert review bodies.

255.    The same pattern appears in *Thakur v. Trump*, No. 25-cv-04737 (N.D. Cal. 2025), where the court enjoined NSF from reversing a prior funding decision through a form notice lacking individualized explanation and issued without consideration of reliance interests.

256.    In all three cases, DOGE's actions were extra-statutory, procedurally defective, and ideologically motivated.

257.    The Government's conduct here is therefore not merely analogous to *ACLS* and *Thakur*—it is factually and legally indistinguishable.

**UNIFIED PATTERN OF EXTRA-STATUTORY INTERFERENCE**

258.    The Government's conduct across NEH, NSF, and *Thakur* reflects a unified pattern of extra-statutory, ideologically driven interference in federal research awards.

259.    DOGE used the same ChatGPT-based DEI-classification tools to override the same congressionally mandated scientific review processes.

260.    Both courts held that such interference is unlawful.

261.    This case presents the same pattern, the same defects, and the same constitutional and statutory violations.

262.    NEH reporting further demonstrates that DOGE's actions were not isolated to a single agency but reflect a broader administrative practice of substituting automated classification tools for the expert, context-rich review required by statute.

263. This pattern reinforces Plaintiff's claims under the APA and the First Amendment and underscores the need for judicial intervention to prevent further unlawful interference with federal research review.

264. NSF improperly changed priorities and returned proposals recommended for PRPAP by DGA.

<strong>SUMMARYOF NSF'S VIOLATIONS</strong>

265. NSF's actions violated many mandated requirements.

266. NSF's actions violated the APA, the PAPPG, the solicitation, the Grant Policy Manual, the TRO, the First and Fifth Amendments, the separation of powers, and the Impoundment Control Act.

267. NSF acted arbitrarily and capriciously by providing no reasoned explanation, ignoring relevant factors, relying on impermissible considerations, and disregarding the evidentiary record.

268. NSF acted contrary to law by violating the APA, the PAPPG, the solicitation, the Grant Policy Manual, the TRO, and constitutional requirements.

269. NSF failed to observe required procedures by ignoring mandatory PAPPG steps, refusing reconsideration and administrative resolution, and failing to provide written reasons.

270. NSF exceeded statutory authority by applying political and ideological criteria not authorized by Congress.

271. NSF failed to follow mandatory PAPPG procedures governing (1) merit review, (2) post-review processing, (3) reconsideration, (4) administrative resolution, and (5) record retention.

272.    NSF's TRO Violations (Consolidated Summary)

273.    NSF violated the TRO by blocking a proposal recommended for PRPAP, applying political and ideological criteria, and disregarding completed merit review.

274.    NSF's First Amendment Violations (Consolidated Summary).

275.    NSF engaged in viewpoint discrimination by penalizing Plaintiff's proposal for required terms such as "equity" and "diversity," in violation of the First Amendment.

276.    NSF's Equal Protection Violations (Consolidated Summary).

277.    NSF treated Plaintiff differently from similarly situated applicants, acted without rational basis, and was motivated by viewpoint discrimination, violating equal protection.

278.    NSF's Unlawful Priority Shift (Consolidated Summary)

279.    NSF applied vague, unpublished, and undefined "agency priorities" without notice, applied them inconsistently, and violated due process,

280.    NSF's Accardi Violations (Consolidated Summary)

281.     NSF failed to follow its own binding rules, violated the Accardi doctrine, and its procedural violations require vacatur.

282.    NSF's Statutory Mandate Violations (Consolidated Summary)

283.     NSF failed to follow statutory mandates requiring support for research advancing equity and inclusion in STEM, merit-based review, and adherence to congressional appropriations.

284.    NSF's Constitutional and ICA Violations (Consolidated Summary)

285.    NSF violated the First Amendment, the Fifth Amendment, the separation of powers, and the Impoundment Control Act.

286.    NSF's Required Procedure Violations (Consolidated Summary)

287.    NSF failed to follow required procedures in the PAPPG, the solicitation, the Grant Policy Manual, the APA, and the TRO.

288.    Final Consolidated Summaries

289.    NSF failed to follow mandatory procedures in the PAPPG, the solicitation, and the Grant Policy Manual.

290.    NSF failed to follow statutory mandates requiring support for equity-advancing STEM research, merit-based review, and adherence to congressional appropriations.

**Unless Enjoined, NSF's Violations Will Cause Irreparable Harm to Plaintiff and the Nation**

291.    Plaintiff has suffered, and will continue to suffer, the following direct, concrete injuries as a result of Defendants' conduct.

292.    Interruption and derailment of ongoing research activities, including the inability to continue multi-year STEM equity studies that depend on continuity of funding and scheduled dissemination.

293.    Career disadvantage, including loss of opportunities to publish research findings, reduced ability to present project-relevant results at national conferences, and diminished ability to obtain related or follow-on grants necessary to sustain a decades-long research trajectory.

294.    Expenditure of substantial time and effort to locate substitute funding, including diversion of Plaintiff's professional time away from research, dissemination, and mentoring responsibilities.

295.    The need to personally support project operations using discretionary or organizational funds, including emergency measures to keep REALSTEM activities viable despite the sudden and unlawful denial of the right to be processed for award.

296.    Reputational injury, including loss of trust and confidence among collaborating institutions, community partners, and professional colleagues who rely on Plaintiff's ability to maintain stable research programs and deliver evidence-based STEM equity interventions.

297.    These direct and particularized injuries to Plaintiff have a damaging ripple effect on the research mission of STEMLIFE, on Plaintiff's ability to train younger researchers, and on the thousands of students and educators nationwide who would benefit from the REALSTEM intervention.

**CLAIMS FOR RELIEF**

**Count I — Arbitrary and Capricious Agency Action (APA § 706(2)(A))**

298.    NSF's Return Without Review ("RWR") must be set aside because it relied on a criterion not authorized by the PAPPG, contradicted the evidentiary record, ignored material information, and reflected procedural irregularities that violate the APA and State Farm.

299.    NSF relied on an unauthorized factor ("agency priorities"), secretly conducted a merit review after issuing an RWR, ignored unanimous "Good" ratings, removed the proposal record from Research.gov, failed to provide written reasons, refused reconsideration and administrative resolution, and ignored reliance interests and mandatory procedures.

300.    Under State Farm and Department of Commerce v. New York, agency action based on unauthorized factors, pretext, or political motives is unlawful. The RWR must be vacated.

**Count II — Unlawfully Withheld and Unreasonably Delayed Action (APA § 706(1))**

301.    NSF unlawfully withheld mandatory actions required by the PAPPG, including providing written reasons for the RWR, processing reconsideration, and processing administrative resolution.

302.    NSF acknowledged Plaintiff's filings but took no action. NSF also unreasonably delayed release of unanimous "Good" ratings for months. Under the TRAC framework, this delay is unreasonable: NSF's inaction is not governed by any rule of reason (Factor 1); Congress expects timely agency action under the APA (Factor 2); the delay prejudices Plaintiff's professional and research interests (Factors 3 and 5); and compelling NSF to act would not disrupt any competing priorities because NSF has already received and processed the underlying materials (Factor 4). Under TRAC, the Court need not find bad faith to conclude that NSF's delay is unlawful (Factor 6).

303.    NSF's refusal to act constitutes unlawfully withheld agency action under 5 U.S.C. §706(1), and Plaintiff is entitled to relief compelling NSF to perform its mandatory duties.

**Count III — First Amendment (Viewpoint Discrimination)**

304.    Plaintiff incorporates by reference all prior paragraphs.

305.    The First Amendment prohibits the government from denying a benefit based on a speaker's viewpoint.

306.    Federal grantmaking must be viewpoint-neutral.

307.    NSF penalized Plaintiff's proposal because it contained terms such as "equity," "diversity," and "inclusion."

308.    NSF applied ideological criteria to Plaintiff's proposal.

309.    NSF's actions constitute viewpoint discrimination.

310.    NSF's actions violated the First Amendment.

**Count IV — Equal Protection (Fifth Amendment)**

311.    Plaintiff incorporates by reference all prior paragraphs.

312.    The Fifth Amendment prohibits arbitrary and discriminatory treatment by federal agencies.

313.    NSF treated Plaintiff differently from similarly situated applicants.

314.    NSF's actions lacked any rational basis.

315.    NSF's actions were motivated by viewpoint discrimination.

316.    NSF's actions violated equal protection.

**Count V — Separation of Powers / Improper Executive Control**

317.    Plaintiff incorporates by reference all prior paragraphs.

318.    Congress—not the Executive Branch—controls federal appropriations.

319.    The Executive Branch may not block, pause, or reverse congressionally authorized funding processes based on political criteria.

320.    NSF implemented Executive Orders and DOGE directives that contravened congressional appropriations.

321.    NSF's actions violated the separation of powers.

**Count VI — Improper Withholding of Appropriated Funds (Impoundment Control Act)**

322.    Plaintiff incorporates by reference all prior paragraphs.

323.    The Impoundment Control Act prohibits the Executive Branch from withholding or obstructing appropriated funds.

324.    NSF obstructed the processing of Plaintiff's proposal after it had been recommended for PRPAP.

325.    NSF's actions violated the Impoundment Control Act.

**Count VII — Declaratory Judgment (28 U.S.C. §§ 2201–2202)**

326.    Plaintiff incorporates by reference all prior paragraphs.

327.    An actual controversy exists between Plaintiff and Defendants regarding the legality of NSF's actions.

328.    Plaintiff seeks a declaration that NSF's actions were unlawful.

**Count VIII — Mandamus (28 U.S.C. § 1361)**

329.    Plaintiff incorporates by reference all prior paragraphs.

330.     NSF has a nondiscretionary duty to follow the PAPPG.

331.    NSF has a nondiscretionary duty to process reconsideration requests.

332.    NSF has a nondiscretionary duty to process administrative resolution requests.

333.    NSF failed to perform these nondiscretionary duties.

334.    Mandamus relief is appropriate.

**Count IX — Accardi Violation**

335.    Plaintiff incorporates by reference all prior paragraphs.

336.    Under the Accardi doctrine, agencies must follow their own rules.

337.    NSF failed to follow the PAPPG, the solicitation, and the Grant Policy Manual.

338.    NSF's violations require vacatur.

**Count X — Violation of the TRO**

339.    Plaintiff incorporates by reference all prior paragraphs.

340.    NSF violated the TRO issued in New York v. Trump.

341.    NSF blocked a proposal recommended for PRPAP.

342.    NSF applied political and ideological criteria.

343.    NSF disregarded completed merit review.

344.    NSF's actions violated the TRO.

**Count XI — Ultra Vires Action**

345.    Plaintiff incorporates by reference all prior paragraphs.

346.    NSF acted without statutory authority.

347.    NSF applied political and ideological criteria not authorized by Congress.

348.    NSF's actions were ultra vires.

**Count XII — Procedural Due Process**

349.    Plaintiff incorporates by reference all prior paragraphs.

350.    Plaintiff had a protected interest in a lawful, merit-based review process.

351.    NSF deprived Plaintiff of this interest without notice or an opportunity to be heard.

352.    NSF's actions violated procedural due process.

353.    Plaintiff is entitled to relief.

**Count XIII — Substantive Due Process**

354.    Plaintiff incorporates by reference all prior paragraphs.

355.    Substantive due process prohibits arbitrary government action that lacks any legitimate governmental purpose.

356.    NSF's actions were arbitrary, irrational, and motivated by impermissible political and ideological considerations.

357.    NSF's actions lacked any legitimate governmental purpose.

358.    NSF's actions violated substantive due process.

**Count XIV — Failure to Consider Reliance Interests**

359.    Plaintiff incorporates by reference all prior paragraphs.

360.    Agencies must consider reliance interests when changing policy or reversing prior determinations.

51

361.  Plaintiff relied on NSF's established merit review procedures, the solicitation's mandatory instructions, and NSF's prior determinations.

362.  NSF failed to identify, acknowledge, or weigh Plaintiff's reliance interests.

363.  NSF's failure to consider reliance interests violated the APA.

**Count XV — Failure to Provide Reasons**

364.  Plaintiff incorporates by reference all prior paragraphs.

365.  Agencies must provide a reasoned explanation for adverse actions.

366.  NSF provided no explanation for reversing the completed review, recommendation, and concurrence.

367.  NSF's failure to provide reasons violated the APA.

**Count XVI — Failure to Follow Mandatory Procedures**

368.  Plaintiff incorporates by reference all prior paragraphs.

369.  NSF failed to follow mandatory procedures in the PAPPG, including procedures governing merit review, post-review processing, reconsideration, administrative resolution, and record retention.

370.  NSF's failure to follow mandatory procedures violated the APA and the Accardi doctrine.

**Count XVII — Failure to Follow the Solicitation**

371.  Plaintiff incorporates by reference all prior paragraphs.

372.  The solicitation required proposals to address equity, diversity, and inclusion in STEM.

373.  Plaintiff complied with the solicitation.

374. NSF penalized Plaintiff for complying with the solicitation.

375. NSF's actions violated the APA and due process.

**Count XVIII — Failure to Follow the Grant Policy Manual**

376. Plaintiff incorporates by reference all prior paragraphs.

377. The Grant Policy Manual imposes mandatory requirements governing administrative review and award processing.

378. NSF failed to follow these requirements.

379. NSF's actions violated the APA and the Accardi doctrine.

380. **Count XIX — Failure to Follow the TRO**

381. Plaintiff incorporates by reference all prior paragraphs.

382. NSF violated the TRO by blocking a proposal recommended for PRPAP.

383. NSF applied political and ideological criteria prohibited by the TRO.

384. NSF disregarded completed merit review in violation of the TRO.

385. NSF's actions violated the TRO and require judicial enforcement.

**Count XX — Failure to Follow Statutory Mandates**

386. Plaintiff incorporates by reference all prior paragraphs.

387. Congress mandated that NSF support research advancing equity and inclusion in STEM.

388. Congress mandated that NSF conduct merit-based review.

389. Congress mandated that NSF adhere to appropriations.

390. NSF failed to follow these statutory mandates.

391. NSF's actions violated the APA and the separation of powers.

**Count XXI — Failure to Follow Constitutional Requirements**

392.   Plaintiff incorporates by reference all prior paragraphs.

393.   NSF violated the First Amendment by engaging in viewpoint discrimination.

394.   NSF violated the Fifth Amendment by treating Plaintiff differently from similarly situated applicants without a rational basis.

395.   NSF violated the separation of powers by implementing Executive Orders that contravened congressional appropriations.

396.   NSF violated the Impoundment Control Act by obstructing appropriated funds.

**Count XXII — Ultra Vires Action (Additional Grounds)**

397.   Plaintiff incorporates by reference all prior paragraphs.

398.   NSF acted without statutory authority by applying political and ideological criteria not authorized by Congress.

399.   NSF acted without statutory authority by reversing a completed merit review process.

400.   NSF acted without statutory authority by disregarding the Program Officer recommendation and Division Director concurrence.

401.   NSF's actions were ultra vires.

**Count XXIII — Declaratory Judgment (Additional Grounds)**

402.   Plaintiff incorporates by reference all prior paragraphs.

403.    An actual controversy exists regarding the legality of NSF's actions.Plaintiff seeks a declaration that NSF's actions were unlawful and that NSF must restore the proposal to its last lawful position.

**PRAYER FOR RELIEF**

404.    Plaintiff incorporates all prior paragraphs and seeks relief to remedy NSF's unlawful actions, restore the integrity of the merit review process, and protect Plaintiff's statutory and constitutional rights.

405.    Vacate Defendants' unlawful Return Without Review ("RWR") and all related determinations, communications, or decisions that removed Plaintiff's REALSTEM proposal from the post-review, pre-award processing pipeline.

406.    The RWR was issued without authority, after full merit review, and in violation of the PAPPG, the APA, the TRO, and constitutional requirements. Vacatur is required under 5 U.S.C. § 706(2).

407.    Order NSF to restore the REALSTEM proposal to its last lawful position— forwarded to DGA for PRPAP following Program Officer recommendation and Division Director concurrence.

408.    Restoration is the standard remedy for Accardi violations and unlawful reversals of completed review and is consistent with federal precedent, including Thakur and NIH's stipulated restoration procedures.

409.    Direct NSF to resume processing in accordance with all mandatory regulations, procedures, and reliance interests; complete each required step of

post-review, pre-award processing; and provide written certification of compliance with each required procedural obligation.

410.    Direct that all further processing, evaluation, or disposition of Plaintiff's REALSTEM proposal occur without involvement by DOGE or its officials.

411.    Maintain supervisory jurisdiction to ensure all further agency actions are lawful, transparent, and consistent with statutory and regulatory protections.

412.    Issue an injunction requiring NSF to process the REALSTEM proposal in accordance with the PAPPG, the solicitation, and the APA.

413.    Plaintiff does not seek an order compelling NSF to fund the proposal—only lawful processing under the rules governing all applicants at the DGA PRPAP stage.

414.    Declare that NSF's actions were unlawful, including violations of the APA, the PAPPG, the solicitation, the TRO, the First Amendment, the Fifth Amendment, the separation of powers, and the Impoundment Control Act.

415.    Declaratory relief is necessary to prevent recurrence and clarify the rights of Plaintiff and similarly situated applicants.

416.    Compel NSF to perform nondiscretionary duties, including processing reconsideration, processing administrative resolution, following the PAPPG, following the solicitation, and following the Grant Policy Manual.

417.    Mandamus is appropriate because NSF failed to perform mandatory duties.

418.    Enjoin NSF from applying political or ideological criteria to Plaintiff's future proposals. Plaintiff intends to submit additional proposals on the same research program, and there is a substantial risk of repeated unlawful interference.

419.    Require NSF to comply with: the TRO issued in New York v. Trump; the APA; the PAPPG; the solicitation; the Grant Policy Manual; statutory mandates requiring support for equity-advancing STEM research, merit-based review, and adherence to appropriations; and constitutional requirements including the First Amendment, the Fifth Amendment, the separation of powers, and the Impoundment Control Act.

420.    Award attorneys' fees and Plaintiff costs under the Equal Access to Justice Act and any other applicable authority.

## CONCLUSION

421.    Defendants' unlawful interference with NSF's merit-based review process has inflicted concrete, particularized, and irreparable harm on Plaintiff and the public. By blocking a proposal formally recommended for post-review processing, Defendants disrupted research, damaged professional standing, and deprived students and educators of congressionally authorized benefits.

422.    This conduct violates the APA, contravenes NSF regulations, disregards a federal court order, and encroaches upon Congress's appropriation authority. The Constitution requires agencies to act within congressional limits, and the APA requires reasoned, lawful decision-making. The public interest demands that taxpayer funds be used for congressionally authorized purposes and that scientific merit review remain insulated from political interference.

423.    Plaintiff respectfully requests that the Court grant declaratory and injunctive relief, vacate Defendants' unlawful action, and remand to compel NSF to restore its normal review process.

424.    This case presents the same legal posture and materially indistinguishable facts as *Thakur v. Trump*, in which both the district court and the Ninth Circuit granted the relief sought.

425.    Granting similar relief here will safeguard separation of powers, protect reliance interests, and ensure dissemination of Plaintiff's work to future generations in service of the public good.

**MASTER EXHIBIT TABLE**

| Exhibit No. | Title | What the Exhibit Proves (One Clear Sentence) |
|---|---|---|
| **Exhibit 1** | NSF Return Without Review (RWR) Email | Proves NSF returned REALSTEM "without review" using a rationale not authorized by the PAPPG. |
| **Exhibit IA** | PAPPG Reasons Provided by NSF for RWR Decision | Proves NSF cited PAPPG Chapters I.E.2 and I.B as the basis for RWR, but none of the eleven exclusive RWR reasons apply to REALSTEM. |
| **Exhibit 1A** | PAPPG Chapter I.E.2 — Exclusive RWR Reasons | Proves NSF may return a proposal without review only **before** merit review and only for eleven exclusive reasons. |
| **Exhibit 1B** | PAPPG Chapter I.B — NSF Program Information | Proves the section NSF cited contains **no RWR authority** and does not support NSF's stated rationale. |

| Exhibit No. | Title | What the Exhibit Proves (One Clear Sentence) |
|---|---|---|
| Exhibit 1C | Plaintiff's Email Requesting Clarification | Proves Plaintiff asked NSF to identify which PAPPG reason applied, and NSF failed to do so. |
| Exhibit 1D | NSF's Failure to Identify Any RWR Reason | Proves NSF could not identify any lawful RWR reason and instead repeated an unauthorized rationale. |
| Exhibit 1E | NSF "Agency Priorities" Explanation | Proves NSF relied on an invented criterion ("agency priorities") not found anywhere in the PAPPG. |
| Exhibit 2 | Panel Reviews | Proves REALSTEM was fully reviewed, rated, and recommended for funding, making RWR procedurally impossible. |
| Exhibit 2A–2F | Individual Reviewer Comments | Proves reviewers found the proposal meritorious and aligned with NSF's stated goals. |
| Exhibit 3 | Program Officer Funding Recommendation | Proves the PO recommended REALSTEM for funding, contradicting NSF's later claim of "inappropriateness." |
| Exhibit 3A | PO Notes | Proves the PO found the proposal responsive and fundable. |
| Exhibit 3B | PO Forwarding to Division Director | Proves the proposal advanced to the next stage of award processing. |
| Exhibit 4 | Division Director Concurrence | Proves the DD concurred with the PO's recommendation, confirming the proposal passed merit review. |
| Exhibit 4A–4G | DD Internal Communications | Proves NSF internally treated REALSTEM as a fundable proposal before the RWR. |
| Exhibit 5 | DGA Award Processing Record | Proves the proposal entered post-review processing, making RWR legally impossible under the PAPPG. |

| Exhibit No. | Title | What the Exhibit Proves (One Clear Sentence) |
|---|---|---|
| **Exhibit 6** | Timeline of NSF Actions | Proves NSF's RWR occurred **after** review, violating its own rules. |
| **Exhibit 7** | Plaintiff's Reconsideration Request | Proves Plaintiff timely challenged the unlawful RWR and identified procedural violations. |
| **Exhibit 8** | Table of Reviewer Ratings | Proves the proposal received strong ratings inconsistent with NSF's stated rationale. |
| **Exhibit 9** | Table of Proposal Compliance | Proves REALSTEM met all formatting, submission, and solicitation requirements. |
| **Exhibit 10** | Table of Solicitation Alignment | Proves REALSTEM directly addressed the solicitation's stated goals. |
| **Exhibit 11** | FOIA Request | Proves Plaintiff sought transparency regarding NSF's decision-making. |
| **Exhibit 12** | FOIA Response | Proves NSF withheld or could not produce documents supporting its RWR rationale. |
| **Exhibit 13** | NSF Public Statements on Priorities | Proves NSF's public priorities contradict the rationale used to reject REALSTEM. |
| **Exhibit 14** | Congressional Mandate on Diversity in STEM | Proves Congress requires NSF to increase participation of underrepresented groups, aligning with REALSTEM's goals. |
| **Exhibit 15** | Scientific Literature on Retrieval Practice | Proves the intervention benefits all student groups, contradicting NSF's claim of exclusivity. |
| **Exhibit 16** | HBCU and PWI Enrollment Data | Proves the proposal includes both underrepresented and non-underrepresented students. |
| **Exhibit 17** | National STEM Achievement Gap Data | Proves the existence and severity of the STEM test-score gap. |

| Exhibit No. | Title | What the Exhibit Proves (One Clear Sentence) |
|---|---|---|
| **Exhibit 18** | McKinsey Report on STEM Workforce Shortage | Proves national economic and security risks if the STEM achievement gap is not closed. |
| **Exhibit 19** | Plaintiff's Prior NSF Awards | Proves Plaintiff's long history of successful NSF-funded research. |
| **Exhibit 20** | Evidence of TRO Requirements | Proves NSF was required to review all proposals and use those reviews in decision-making. |
| **Exhibit 21** | Evidence NSF Violated TRO | Proves NSF conducted reviews but then disregarded them. |
| **Exhibit 22** | Comparison of Solicitation Requirements vs. REALSTEM Content | Proves REALSTEM complied with every requirement of the solicitation. |
| **Exhibit 23** | Evidence of Political Influence | Proves NSF's decision was influenced by political directives inconsistent with the PAPPG. |
| **Exhibit 24** | Evidence of Unpublished Criteria | Proves NSF applied criteria not published in the solicitation or PAPPG. |
| **Exhibit 25** | Evidence of Differential Treatment | Proves NSF treated REALSTEM differently from similarly situated proposals. |
| **Exhibit 26** | FOIA-Produced Internal NSF Emails | Proves NSF staff discussed non-PAPPG factors in evaluating proposals. |
| **Exhibit 26A–26B** | Additional FOIA Documents | Proves NSF's internal rationale differed from its stated rationale. |
| **Exhibit 27** | Timeline of Political Directives | Proves NSF's decision coincided with political pressure inconsistent with scientific integrity. |

Respectfully submitted,

61



Obed Norman

Plaintiff, Pro Se

3010 St. Paul Street

Apt. 2

Baltimore, MD 21218

Telephone: 443-648-1028

Email: onorman6@gmail.com

This filing was prepared by Plaintiff pro se with the assistance of AI tools. Plaintiff has reviewed the entire document, including all citations and factual statements, for accuracy and compliance with all applicable rules.